UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

| | |
|---|---|
| CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ICG, INC. a/k/a INTERNATIONAL COAL GROUP, INC., WILBUR L. ROSS, JR., JON R. BAUER, CYNTHIA B. BEZIK, WILLIAM J. CATACOSINOS, BENNETT K. HATFIELD, MARCIA L. PAGE, WENDY L. TERAMOTO, WILLIAM D. CAMPBELL, UBS INVESTMENT BANK and LEHMAN BROTHERS,<br><br>Defendants. | No. 2:07-0226 |

**AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiffs City of Ann Arbor Employees' Retirement System ("Ann Arbor") and AIP Alternative Strategies Funds – Alpha Hedged Strategies Fund ("AIP") (collectively "Plaintiffs"), make the following allegations, except as to allegations specifically pertaining to Lead Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Lead Plaintiffs' counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about ICG, Inc. a/k/a International Coal Group, Inc. ("ICG" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company and believe that substantial additional support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons or entities who bought ICG common stock pursuant and/or traceable to the Company's November 21, 2005 Reorganization (the "Reorganization") and/or the Company's December 7, 2005 initial public offering (the "IPO" or the "Offering") (the "Class") seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l and 77o.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

3. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b). Many of the violations of law complained of herein occurred in this District, and ICG conducts business and is headquartered in this District.

4. In connection with the acts alleged in this complaint, Defendants used the instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities markets.

## **PARTIES**

5. Ann Arbor purchased shares of ICG stock in the IPO and has suffered substantial damages as a result thereby.

6. AIP purchased shares of ICG stock traceable to the Reorganization Registration Statement, as defined herein, and in the IPO and has suffered substantial damages as a result thereby.

7. ICG maintains its executive offices in Scott Depot, West Virginia. The Company, through its subsidiaries, engages in the production, processing and sale of coal.

8. Defendant Wilbur L. Ross ("Ross") was at all relevant times Chairman of the Board of Directors of ICG. Ross signed the Company's Form S-1 and Form S-4 Registration Statements.

9. Defendant Jon R. Bauer served as a director of ICG at all relevant times. Bauer signed the Company's Form S-1 and Form S-4 Registration Statements.

10. Defendant William J. Catacosinos served as a director of ICG at all relevant times. Catacosinos signed the Company's Form S-1 and Form S-4 Registration Statements.

11. Defendant Cynthia B. Bezik served as served as a director of ICG at all relevant times. Bezik signed the Company's Form S-1 and Form S-4 Registration Statements.

12. Defendant Bennett K. Hatfield ("Hatfield") served as President, Chief Executive Officer ("CEO"), and a director of ICG at all relevant times. Hatfield signed the Company's Form S-1 and Form S-4 Registration Statements.

13. Defendant Marcia L. Page served as a director of ICG at all relevant times. Page signed the Company's Form S-1 and Form S-4 Registration Statements.

14. Defendant Wendy L. Teramoto ("Teramoto") served as a director of ICG at all relevant times. Teramoto signed the Company's Form S-1 and Form S-4 Registration Statements.

15. Defendant William D. Campbell served as Vice President and Treasurer of ICG at all relevant times. Campbell signed the Company's Form S-1 and Form S-4 Registration Statements.

16. The individuals named in ¶¶8-15 are sometimes collectively referred to hereinafter as the "Individual Defendants."

17. Each of the Individual Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained in the documents filed by the Company with the SEC in connection with the Reorganization and IPO ("IPO Documents"). Because of their Board memberships, executive and managerial positions, and/or extensive holdings of ICG securities, each of the Individual Defendants was responsible for ensuring the truth and accuracy of the various statements contained in the Company's IPO Documents.

18. The Individual Defendants, because of their management positions, membership on the ICG Board of Directors and/or their extensive ownership of ICG's common stock, had the power and influence to direct the management and activities of ICG and its employees. Accordingly, the Individual Defendants were able to, and did, control the contents of the IPO Documents complained of herein. Each defendant, as signatory to the IPO Documents, was provided copies of the untrue and misleading IPO Documents prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

19. Defendants UBS Investment Bank ("UBS") and Lehman Brothers, Inc. ("Lehman") (collectively, the "Underwriter Defendants"), acting as Lead Underwriters, organized a syndicate which underwrote the IPO. The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities and acting as marketmakers in

publicly traded securities. In connection with the IPO, representatives of the Underwriter Defendants had access to ICG and its top executives, including the Individual Defendants, and thus had access to and/or obtained ICG's internal corporate information, including the adverse information omitted and/or misrepresented with regard to safety and maintenance, as alleged herein.

20. The Underwriter Defendants, directly and through their agents and representatives, assisted ICG and the Individual Defendants in planning the IPO and were supposed to conduct an adequate and reasonable investigation into the business and operations of ICG, an undertaking known as a "due diligence" investigation. In the course of the investigation, the Underwriter Defendants and their agents met with representatives, employees and agents of ICG, including Ross and others, and reached understandings as to (1) the strategy to best accomplish the IPO; (2) the terms of the IPO; (3) the language to be used in the IPO Documents; (4) the disclosures ICG would make in the IPO Documents; and (5) the responses that would be made to the SEC in connection with their review of the IPO Documents.

21. ICG, the Individual Defendants, and the Underwriter Defendants are sometimes collectively referred to hereinafter as "Defendants."

## CLASS ACTION ALLEGATIONS

22. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class, as defined above. Excluded from the Class are Defendants, members of the immediate family of the Individual Defendants, any subsidiary or affiliate of ICG, UBS or Lehman, and the directors, officers and employees of ICG, UBS or Lehman or their subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

23. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States. ICG issued and exchanged millions shares in the Reorganization and issued and sold approximately 21 million shares of common stock in the IPO. Record owners, beneficial owners, and other members of the Class may be identified from records maintained by ICG and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

24. Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

26. Common questions of law or fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law or fact common to the Class are:

(a) Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b) Whether the Registration Statements issued by Defendants to the investing public in connection with the Reorganization and/or IPO were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not misleading and were not prepared in accordance with the rules and regulations governing their preparation; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

27. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy and common questions of law and fact predominate over individual questions. Because the joinder of all individual claim members is impracticable and the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this case as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and its Business

28. ICG is a leading producer of coal in Northern and Central Appalachia. With 25 coal mines in four states, ICG markets a broad range of sulfur steam and metallurgical coal to a customer base consisting largely of investment grade electric utilities, as well as domestic and international industrial customers.

29. In 2006, ICG's Central Appalachia mines produced 11.2 million tons of coal, while its mines in Northern Appalachia produced 3.2 million tons of coal. Approximately 95% of the coal shipped by these mines in 2006 was destined for electric utilities, mostly in the eastern half of the United States, including Georgia Power Company, Duke Power and Carolina Power & Light Company.

30. Coal represents over 25% of the world's primary energy consumption. In 2006, coal-fired plants generated approximately 50% of the electricity produced in the United States. Because, by its very nature, coal mining is a dangerous activity, federal and state agencies have established a comprehensive scheme of laws and regulations designed to ensure miner health, safety and welfare.

Compliance with these safety measures is paramount because, not only do they protect miners from death or injury, but work stoppages due to safety and maintenance problems lead to decreased production and, ultimately, adverse financial results.

**The Creation of ICG**

31. Ross was the driving force behind the formation of ICG. In 1999, Ross – with no prior experience in the coal industry but with a history of purchasing and consolidating distressed companies in other industries – started buying interests in Anker Coal Group, Inc. and its consolidated subsidiaries ("Anker"). Ross saw tremendous potential in this regional coal company because Anker owned rights to hefty, untapped coal deposits.

32. In order to raise much needed capital to cover its growing debts, Anker – then the owner of West Virginia's Sago mine – issued $125 million in bonds in 1999. Three years later, in 2002, having defaulted on more than $6 million in interest due to bondholders, Anker filed for bankruptcy. At the time of Anker's bankruptcy in late 2002, Ross had accumulated a substantial interest in Anker, controlling $37.3 million in Anker debt and 47 percent of its preferred stock. Not only was Ross Anker's largest shareholder, but he also was one of only four people to hold a seat on the company's board of directors.

33. As Anker emerged from bankruptcy in 2003, it projected increased production out of its West Virginia mines, including Sago. Yet, even as operations at Sago and other mines rapidly expanded throughout 2004, Anker continued losing money. The company's declining position made it ripe for a takeover by Ross, particularly since Teramoto, a long-time associate of Ross, had been serving as Anker's chairman.

34. Against this backdrop, Ross set in motion a series of events aimed at obtaining full control of Anker. To that end, in May 2004, Ross' investment firm, WL Ross & Co. LLC ("WL

Ross"), and other investors formed ICG, Inc. for the purpose of acquiring and operating coal mining facilities, including Anker. With offices in New York City, Tokyo and Seoul, WL Ross specializes in investing in distressed companies around the world on behalf of partnerships funded by major U.S. institutional investors. Since its founding in April 2000, WL Ross has created private equity partnerships and hedge funds with more than $1 billion of investments. Ross serves as the Chairman and CEO of WL Ross and Teramoto serves as one of its Senior Vice Presidents.

35. After forming ICG, Ross did not act as an absentee investor. Rather, he used his influence and control to obtain a substantial windfall for WL Ross. Indeed, pursuant to an October 2004 Advisory Services Agreement, ICG agreed to pay WL Ross $14 million for various "consulting and advisory services." More specifically, over the seven-year term of the contract, ICG guaranteed WL Ross payment of $500,000 per quarter.

36. ICG's first significant foray into coal mining operations involved the acquisition of Horizon NR, LLC ("Horizon") and certain of its subsidiaries. Due to severe financial and operational difficulties, Horizon had filed for bankruptcy twice during 2002. But, despite Horizon's problems, Ross believed that the company had great potential. Consequently, ICG paid nearly $300 million through a bankruptcy auction for certain of Horizon's key assets. ICG completed the transaction in September 2004.

37. Shortly after acquiring Horizon, Ross set out to complete his takeover of Anker and to purchase CoalQuest Development, LLC ("CoalQuest"), another regional coal producer and Anker subsidiary. At this time, Teramoto served as Sole Manager and CEO of CoalQuest. On March 31, 2005, ICG entered into agreements to acquire both Anker and CoalQuest in a stock-for-stock transaction through which the stockholders of Anker, collectively, received 14,840,909 shares of ICG common stock, while the members of CoalQuest, collectively, received 9,250,000 shares.

38. ICG determined that the best way to accomplish these acquisitions was through a holding company reorganization through which shares of "old" ICG would be swapped for shares of "new" ICG in a one-for-one tax-free exchange. Through this reorganization, ICG would become the new top-tier parent holding company while Anker and CoalQuest became wholly owned subsidiaries. In addition, the directors and officers of "old" ICG would continue to serve in the same positions for "new" ICG.

**At the Time of the Reorganization and IPO**
**ICG Was Not Maintaining and Operating its Mines in a Safe Manner**

39. As detailed herein, at the time of the Reorganization and IPO, ICG was not operating its mines in a safe manner and was subject to numerous material and repeated safety violations. In fact, the safety violations at certain of the Company's mines were far beyond the customary and ordinary safety issues generally presented at coal mining operations and exposed the Company to the heightened risk that it would incur substantial liability and/or adverse financial results as a result of its poor safety and maintenance record. Indeed, the Company failed to devote enough resources to ensuring that its mines were operated in a safe manner and, instead, focused on dramatically increasing coal production and maximizing mining profits.

40. By June 2005, ICG began providing management services to numerous Anker mines, including the Sago mine in West Virginia. Thus, by the time of the issuance of the Reorganization Registration Statement (in November 2005) and IPO Registration Statement (in December 2005), if not earlier, ICG knew that it was experiencing significant and repeated safety issues at numerous mines. As detailed below, these safety issues were frequently "significant and substantial" in nature and, on the whole, evidenced a conscious decision to disregard the safe operation of the mines in order to increase production and profits.

41. **Sago Mine**: The Sago mine is an underground facility in Upshur County, West Virginia, located near the town of Buckhannon. In 2004, Sago had an injury rate that was three times that of similar-size underground mines across the country. In 2005, Sago was cited for over 200 violations of U.S. Mine Safety and Health Administration ("MSHA") regulations.[1] The MSHA employs a negligence scale to assess an operator's culpability for allowing violations to occur. Sago mine violations were classified as involving a "High" degree of negligence 8% of the time in 2005, almost three times higher than the national average.

42. In addition, the MSHA further documented the large number of "significant and substantial" (known as "S&S") violations at Sago. In determining whether a violation could "significantly and substantially contribute to the cause and effect of a mine safety or health hazard," the inspector must first find that an injury or illness would be reasonably likely to occur if the violation was not corrected and, if the injury or illness were to occur, such injury would be reasonably serious. At the Sago mine in 2005, a stunning 48% of citations and orders were deemed "S&S," far in excess of the nationwide average of 38%.

43. More specifically, in just one day – September 12, 2005 – Sago received in excess of $25,000.00 in fines, a substantial amount under federal regulations, from MSHA investigators for allowing the accumulation of combustible materials and deficiencies in its pre-shift examinations. Similarly, during an inspection period running from early October to late December 2005 – before and during the Reorganization and IPO – MSHA investigators issued 46 citations and three orders

---

[1] According to its website, the MSHA is a federal agency created "to administer the provisions of the Federal Mine Safety and Health Act of 1977 (Mine Act) and to enforce compliance with mandatory safety and health standards as a means to eliminate fatal accidents; to reduce the frequency and severity of nonfatal accidents; to minimize health hazards; and to promote improved safety and health conditions in the Nation's mines."

for a variety of safety violations at the mine. Inspectors listed 18 of those violations as "S&S," meaning investigators believed the cited hazards were likely to cause an accident that would seriously injure a miner. In that same time frame, the MSHA cited Sago for violating its approved roof control and mine ventilation plans, as well as for violations concerning emergency escapeways and required pre-shift safety examinations.

44. Due to the severity and pervasiveness of the safety violations at Sago, MSHA officials determined that it would have to devote increased resources to monitoring Sago during 2005. In this regard, the MSHA elevated the level of enforcement at Sago in response to continuing compliance problems arising from the number of roof falls that were occurring, the increase in the injury incidence rate, and ICG's apparent indifference to compliance with safety regulations. As a result, MSHA personnel frequently met with Sago mine managers during 2005 to emphasize the need for increased compliance at the mine.

45. The increased level of enforcement by the MSHA caused a substantial increase in the number of "unwarrantable failure" citations issued in 2005. From May 2005 through December 2005, the MSHA cited Sago over a dozen times for extremely serious 104(d) violations, known as "unwarrantable failures." Under MSHA regulations, a 104(d) citation shall only be issued if (1) there is a violation of a mandatory health or safety standard; (2) the violation significantly and substantially contributes to the cause and effect of a mine safety or health hazard; ***and*** (3) there is an unwarrantable failure of the mine operator or contractor to comply with the standard. Furthermore, mere negligence or reckless disregard is insufficient to warrant a 104(d) violation. That is, a violation is caused by an unwarrantable failure if it is determined that the mine operator or contractor has engaged in aggravated conduct constituting more than ordinary negligence.

46. For example, on July 12, 2005 – one month after ICG began providing management services at Sago – the mine was cited by the MSHA for exposing miners to hazards relating to reduced sight lines. This 104(d) citation, for which Ross-controlled Anker paid a fine, concluded that:

> [t]he ***failure of management*** to provide reasonable sight lines for the miners to follow demonstrates higher than normal neglect as sight lines are fundamental to the systematic development of a section. This section is a set of mains that will be utilized for years. The small block sizes can not be completely replaced. ***The miners will be exposed to the danger done for several years to come.*** (Emphasis added).

47. On December 14, 2005 – less than one week after the IPO – ICG's Sago mine received another 104(d) citation and fine because dangerous accumulations of coal were observed left over from previous mining shifts. In the citation, an MSHA safety inspector noted that operator ICG "has showed a ***high degree of negligence for the health and safety of the miners that work in this coal mine*** by allowing the conditions to exist. This is an unwarrantable failure to comply with a mandatory standard." (Emphasis added).

48. In addition to the numerous safety violations found by the MSHA, the Sago mine ran afoul of the West Virginia Office of Miners' Health, Safety and Training, the state agency responsible for administering West Virginia's mine safety laws and regulations. During 2005 alone, this agency cited Sago for 143 violations of state mine safety laws and regulations, many involving "high" negligence and/or repeat occurrences.

49. Overall, ICG's Sago mine's safety record compared poorly to other similarly sized mines in West Virginia. A January 4, 2006 article in *USA Today* that analyzed Sago's safety record found the ICG mine had far more violations and far more accidents than other comparable mines. In fact, Sago had 40 accidents in 2005 alone, compared to a maximum of 12 accidents at the mines used in *USA Today's* analysis.

50. **Other Problem Mines**: Widespread safety and maintenance troubles at ICG spread far beyond the Sago mine. For example, the Viper mine, an underground coal mine in central Illinois, was fined by the MSHA for numerous serious safety infractions throughout 2005. From August through December 2005, as ICG prepared for and completed the Reorganization and IPO, the Viper mine racked up citations and fines for 47 safety and maintenance violations. Of those violations, the MSHA considered 17 to be "serious and substantial," including numerous relating to the failure to protect miners from roof falls.

51. The Birch River Mine, a strip mine in Webster County, West Virginia, was taken over by ICG in October 2004. Under ICG ownership, the mine's nonfatal accident rate worsened in 2005, increasing from 2.17 injuries per 200,000 hours worked to 3.25 injuries per 200,000 hours worked. In 2005, the Birch River Mine's accident rate was twice the national average. During that time, MSHA inspectors identified 37 safety violations at the Birch River Mine, 12 of which were deemed "serious and substantial."

52. From February 7, 2006 until April 3, 2006, as the Sago disaster put ICG mines in the spotlight, MSHA inspectors cited the Birch River Mine an additional 13 times. Those 13 citations, all but one of which was considered "serious and substantial," resulted in a whopping $120,588.00 in penalties. These serious violations stemmed from, *inter alia*, ICG's failure to use proper electrical connections, failure to correct equipment defects, accumulations of combustible materials, and failure to maintain safe access ways.

53. ICG's Sentinel Mine, also a former Anker mine, is an underground operation in Barbour County, West Virginia. In 2004 and 2005, the Sentinel Mine recorded injury rates of 6.5 and 4.4 times the national average for similar mines, respectively. In addition to its alarming injury rates, the Sentinel Mine was oft-cited by MSHA investigators in 2005. In fact, during 2005 alone,

MSHA inspectors fined the mine for over 110 safety and maintenance violations, 44 of which were deemed "serious and substantial."

54. Yet another ICG mine – the Stony River Mine in Grant County, West Virginia – in 2005 recorded a nonfatal injury rate of nearly 28 injuries per 200,000 hours worked. This is over four times higher than the national average of 6.54 injuries per 200,000 hours worked.

55. Numerous other ICG mines have received large numbers of citations for safety and maintenance violations. One such mine, the Blackberry Creek Mine, located in Pike County, Kentucky, was cited over 65 times in 2005. Another, the Flint Ridge Mine in Breathitt County, Kentucky, amassed 27 citations in December 2005 alone. Yet another, Knott County, Kentucky's Cavalry Mine, received over 100 citations in 2005.

**The Reorganization Registration Statement**

56. On or about June 27, 2005, in connection with the Reorganization and to facilitate the one-for-one exchange of shares contemplated thereby, ICG filed a Registration Statement on Form S-4 with the SEC. On or about November 9, 2005, the Company filed an Amended Form S-4/A with the SEC (the "Reorganization Registration Statement"). Then, on or about November 21, 2005, the Prospectus, which was incorporated into and formed part of the Reorganization Registration Statement, was declared effective.

57. The Reorganization Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

58. Specifically, the Reorganization Registration Statement failed to disclose that ICG was not operating its mines in a safe manner and was subject to numerous material and repeated

safety violations. Indeed, as noted above, certain of the Company's mines were subject to material and repeated safety violations which were far beyond the customary and ordinary safety issues generally presented at coal mining operations and which exposed the Company to the heightened risk that it would incur substantial liability and adverse financial results as a result of its poor safety record.

59. In a section entitled "Environmental and Other Regulatory Matters," the Reorganization Registration Statement represented that the Company had a strong commitment to safety and minimized its violations of safety regulations stating in pertinent part as follows:

> We endeavor to conduct our mining operations in compliance with all applicable federal, state and local laws and regulations. However, due in part to the extensive and comprehensive regulatory requirements, violations during mining operations occur from time to time in the industry.

60. With respect to the acquisition of Anker and CoalQuest, the Reorganization Registration Statement represented that "operational improvements" at Anker had significantly improved recent operating performance stating in pertinent part as follows:

> Furthermore, we may not be able to realize the expected benefits of these acquisitions. For example, as a result of infrastructure weaknesses and short-term geologic issues at Anker, the transition period for implementation of various operational improvements has taken longer than originally anticipated. This extended transition has resulted in, and will continue to result in, decreased coal production and increased production costs in the third and fourth quarters. Since these issues are temporary in nature and recent operating performance has significantly improved, 2006 profit margins are not expected to be materially impacted.

61. The Reorganization Registration Statement provided the following positive description of the Sago mine:

> The Spruce Fork Division currently consists of two active underground mines: Spruce No. 1 and Sago located in Upshur County, West Virginia, near the town of Buckhannon. The Spruce No. 1 Mine is extracting coal from the Upper Freeport seam and the Sago mine is extracting coal from the Middle Kittanning seam. Nearly all of the reserves in the Spruce Fork Division are owned by ICG. The Spruce No. 1 Mine opened in 1997 and we anticipate that its reserves will be depleted sometime during the third quarter of 2005. The Sago mine, which was

> originally opened in 1999 as a contract mine, closed in 2002, and then reopened as a captive operation in the first quarter of 2004. Sago is expected to reach full production by the fourth quarter of 2005.
>
> Both operations utilize the room-and-pillar mining method with continuous miners and shuttle cars for coal extraction. All of the coal extracted from these mines is processed through the nearby Sawmill Run preparation plant where coal is then primarily shipped by CSX rail, although some coal is trucked to local industrial customers.
>
> We have projected that the Spruce Fork Division will produce approximately 1.3 million tons of coal in 2005. The Sago 3 mine, scheduled for production in 2007, is a replacement for the Spruce No. 1 Mine. The reserves at Spruce Fork have characteristics that make it marketable to both steam and metallurgical coal customers.

62. The statements referenced above in ¶¶59-61 contained untrue statements of material fact because Defendants failed to disclose or otherwise omitted that ICG's mines were not operated in a safe manner, were cited and fined for numerous and repeated safety violations by federal and state agencies and, thus, ICG's horrible safety record exposed the Company to significant liability and adverse financial consequences if mining operations were disrupted due to safety issues. Consequently, Defendants had no reasonable basis to state that ICG had a strong commitment to safety and that "2006 profit margins are not expected to be materially impacted."

63. In addition, under applicable SEC rules and regulations governing the preparation of a Registration Statement and Prospectus, the Reorganization Registration Statement was required to disclose the safety and maintenance problems at ICG mines and the potential impact those problems would have in the near future as detailed herein. The Reorganization Registration Statement failed to contain any such disclosure. Specifically:

(a) Pursuant to Item 11(h) of Form S-1, a Registration Statement is required to furnish the information required by Item 303 of Regulation S-K. Under Item 303(a) of Regulation S-K an issuer is required to, among other things, "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable

impact on net sales or revenues or income from continuing operations." The widespread safety and maintenance problems ICG mines were then having, and would continue to have, an unfavorable impact on the Company's revenues and income from continuing operations and, therefore, were required to be disclosed in the Reorganization Registration Statement but were not; and

(b) Pursuant to Item 3 of Form S-1, a Registration Statement is required to furnish the information required by Item 503 of Regulation 503. Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative." The widespread safety and maintenance problems at ICG mines were then negatively impacting the Company's coal production and would lead to shutdowns of several mines, as described herein. Accordingly, the production problems were a "significant factor" that made the Reorganization "risky or speculative" and was required to be disclosed in the Reorganization Registration Statement and December Registration Statement but were not.

64. On November 18, 2005, ICG completed the Reorganization. On November 21, 2005, ICG's common stock commenced trading on the New York Stock Exchange under the symbol ICO.

**The IPO Registration Statement**

65. Following the Reorganization, ICG pushed ahead with its plans for a public offering of stock to raise capital. In connection therewith, on November 9, 2005, the Company filed its Form S-1/A with the SEC (the "IPO Registration Statement"). Then, on or about December 7, 2005, the Prospectus, which was incorporated into and formed part of the IPO Registration Statement, was filed with the SEC.

66. The IPO Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements

made therein not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

67. Specifically, the IPO Registration Statement failed to disclose that ICG was not operating its mines in a safe manner and was subject to numerous material and repeated safety violations. Indeed, as detailed above, certain of the Company's mines were subject to material and repeated safety violations which were far beyond the customary and ordinary safety issues generally presented at coal mining operations and which exposed the Company to the heightened risk that it would incur substantial liability and adverse financial results as a result of its poor safety record.

68. The IPO Registration Statement highlighted the Company's safety record representing that the Company had "recognized leadership in safety and environmental stewardship" and noting that the Company's "focus on safety and environmental performance" reduced the "likelihood of disruption of production at our mines. . . ." The IPO Registration Statement stated in pertinent part as follows:

> **Recognized leadership in safety and environmental stewardship.** The injury incident rates at our mines throughout 2004, according to the Mine Safety and Health Administration, or MSHA, were below industry averages. . . . ***Our focus on safety and environmental performance results in the reduced likelihood of disruption of production at our mines, which leads to higher productivity and improved financial performance.*** [Emphasis added.]

69. The IPO Registration Statement described the Company's business strategy stating in pertinent part as follows:

> **OUR BUSINESS STRATEGY**
>
> ***Maximize profitability through highly efficient and productive mining operations.*** We are continuing to evaluate and assess our current operations in order to maximize operating efficiency and returns on invested capital. We are focused on maintaining low-cost, highly productive operations by continuing to invest substantial capital in state-of-the-art equipment and advanced technologies. We expect to internally fund approximately $304 million of capital expenditures in the next two years. As we take advantage of planned expansion opportunities from 2007 through 2009 principally as

a result of the Anker and CoalQuest acquisitions, we expect to spend approximately $627 million on capital expenditures, which may require external financing.

70. With respect to importance of its purported focus on workplace safety, the IPO Registration Statement stated in pertinent part as follows:

> ***Continue to focus on improving workplace safety and environmental compliance. We have maintained and plan to continue to maintain an excellent safety and environmental performance record. We continue to implement safety measures and environmental initiatives that are designed to promote safe operating practices and improved environmental stewardship among our employees***. Our ability to maintain a good safety and environmental record improves our productivity and lowers our overall cost structure as well as bolsters employee morale. [Emphasis added].

71. Finally, the IPO Registration Statement contained a section entitled Industry data, which stated in pertinent part as follows:

> Statements relating to our leadership in safety and environmental performance are based on our receipt of numerous awards from state and federal agencies, including awards from the Mine Safety and Health Administration, or MSHA, the principal federal agency regulating health and safety in the coal mining industry, and the Office of Surface Mining, the principal federal agency regulating environmental performance in the coal mining industry.

72. The statements referenced above in ¶¶68-71 contained untrue statements of material fact because Defendants failed to disclose or otherwise omitted that ICG's mines were not operated in a safe manner, were cited and fined for numerous and repeated safety violations by federal and state agencies and, thus, ICG's horrible safety record exposed the Company to significant liability and adverse financial consequences if mining operations were disrupted due to safety issues. Consequently, Defendants had no reasonable basis to state, *inter alia*, that (a) ICG had injury incident rates that were below industry averages; (b) ICG had a "focus on safety and environmental performance;" (c) ICG ran mining operations that were "highly efficient and productive;" and (d) ICG had an "excellent safety and environmental performance record."

73. In addition, under applicable SEC rules and regulations governing the preparation of a Registration Statement and Prospectus, the IPO Registration Statement was required to disclose the safety and maintenance problems at ICG mines and the potential impact those problems would have in the near future as detailed herein. The IPO Registration Statement failed to contain any such disclosure. Specifically:

(a) Pursuant to Item 11(h) of Form S-1, a Registration Statement is required to furnish the information required by Item 303 of Regulation S-K. Under Item 303(a) of Regulation S-K an issuer is required to, among other things, "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The widespread safety and maintenance problems ICG mines were then having, and would continue to have, an unfavorable impact on the Company's revenues and income from continuing operations and, therefore, were required to be disclosed in the IPO Registration Statement but were not; and

(b) Pursuant to Item 3 of Form S-1, a Registration Statement is required to furnish the information required by Item 503 of Regulation 503. Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative." The widespread safety and maintenance problems at ICG mines were then negatively impacting the Company's coal production and would lead to shutdowns of several mines, as described herein. Accordingly, the production problems were a "significant factor" that made the IPO "risky or speculative" and was required to be disclosed in the IPO Registration Statement but were not.

74. Through the IPO, ICG sold 21 million shares of its common stock at $11.00 per share, thereby raising approximately $210.5 million. On December 12, 2005, ICG successfully

completed its public offering of 21 million shares of common stock. The proceeds were used to repay $188.7 million of term loan debt and $21.2 million of borrowings under the Company's revolving credit facility.

**Fallout From Revelations of Widespread Safety Violations at ICG Mines Causes the Price of ICG Stock to Decline**

75. On January 2, 2006, just four weeks after the completion of the IPO, an underground explosion at the Sago mine left 12 miners dead and another with serious injuries. Investigators agree that methane began to accumulate within an area which had been previously mined and then sealed with 40-inch-thick block seals. The explosion occurred within the sealed area, completely destroying the seals and causing portions of the mine to fill with toxic levels of carbon monoxide.

76. The tragedy at Sago led to a proliferation of news reports which disclosed and detailed the Company's poor safety record at many of its mines. As news of widespread safety violations and government investigations trickled into the market after Sago and through February 2006, ICG attempted to counteract the market's fears about its safety record and support the price of ICG stock with several positive press releases. For example, on January 23, 2006, ICG issued a press release entitled "International Coal Joins Senate Effort to Improve Mine Safety" which described Hatfield's testimony before a U.S. Senate Appropriations Subcommittee concerning his assurances that the Sago mine disaster "will lead to improvements throughout the industry." The press release further quoted Hatfield: "While the tragic events of January 2 confirm that we must be ever vigilant on mine safety, the safety record at the Sago Mine demonstrates that our management team aggressively focused on mine safety."

77. However, amid an avalanche of media accounts documenting its hundreds of safety violations, ICG suggested that its safety record was not as "excellent" as previously disclosed. On

February 1, 2006, ICG announced that all of its mines and shipping facilities would "begin each shift with a special in-depth safety review." The Company further announced:

> This procedure will include not only West Virginia operations, but also those in Kentucky, Illinois, and Maryland.
>
> Mine managers will discuss safety issues presented in each of the fatal accidents that have occurred in West Virginia, which will include risks associated with roof and rib control, belt fires, operating equipment in close proximity to gas wells – and will specifically reinforce mine evacuation plans.

78. By March 1, 2006, the price of ICG had declined to $8.45 per share – over 23% below the IPO price.

79. Then, in a series of announcements, ICG reported declining financial results, which it attributed in material part to the Sago mine disaster and other operational challenges impacting the Company.

80. On June 6, 2006, ICG issued a press release in which it lowered its financial outlook for fiscal year 2006. The Company attributed the lowered outlook to the negative impact of a number of factors, including a fire at the Company's Illinois Viper mine, which resulted in a 30-day loss of production and significant repair costs. Commenting on the lowered earnings projections, Hatfield told the market:

> We have faced an unprecedented number of operating challenges thus far in 2006, many of which have demanded an extraordinary amount of time and attention from our management team.

81. On June 8, 2006, ICG held a conference call with investors to discuss its earnings announcement and the Company's operations. During the conference call, Davenport & Company analyst Mark Levin asked about the impact from increased MSHA inspections in the wake of the Sago disaster. In response to the question, Hatfield stated:

> It's certainly there, Mark. I mean, it's a good question. We're seeing, certainly, a lot more intensity and frequency of inspections, but it's hard to measure the impact. ***There's little doubt that – that they're much quicker to write up a citation and shut***

> ***down a section if something's off base and that's the kind of reaction you would expect, given some of the disastrous accidents that have occurred in the industry thus far this year.*** But it's pretty tough to measure the impact in specific dollars. But I would say it's not a major impact. ***It's just a matter of us being required to do a better job and, frankly, we as an industry need to do a better job.*** [Emphasis added.]

In admitting that ICG needed to "better job" with respect to safety, Hatfield also acknowledged that increased inspections resulting from the aftermath of Sago could further negatively impact the financial performance of ICG.

82. In response to these disclosures, the price of ICG stock declined from $8.50 per share on June 6, 2006 to $7.00 per share on June 8, 2006 on extremely heavy trading volume.

83. Three months later, on September 12, 2006, ICG again lowered its financial guidance for 2006. In part, ICG blamed its lowered guidance on the events at Sago and the Viper mine, stating in pertinent part as follows:

> Including the effects of the unusual first half events of the Sago mine accident and the Viper mine fire, which negatively impacted earnings by approximately $15 million to date, earnings for the full year are now projected to be a net loss of between $10 million and $15 million, or a net loss of $0.07 to $0.10 per fully diluted share, compared to earlier guidance of $23 million to $30 million and $0.15 to $0.21 per fully diluted share.

This announcement shocked the market and, on the next day, the price of ICG fell 18 percent to close at $4.78 per share on extremely heavy trading volume. The stock bottomed out at $4 per share on September 25, 2006 – over 63% below the IPO price – and has never recovered.

84. Over a year after the Sago mine disaster, the results of multiple investigations into the events of January 2, 2006, including detailed studies conducted by MSHA and the United Mine Workers of America, were released to the public. These investigative reports further corroborated and provided additional details concerning ICG's woeful safety record prior to and during the Reorganization and IPO.

**FIRST COUNT**

**For Violations of Section 11 of**
**The Securities Act Against All Defendants**

85. Plaintiffs incorporate each of the foregoing allegations set forth in ¶¶1-84 above as if fully set forth herein, except to the extent that such allegations charge Defendants with intentional or reckless misconduct. For the purposes of this Count, Plaintiffs expressly disavow any allegation that any defendant acted with scienter or fraudulent intent, which is not an element of a Securities Act claim.

86. The IPO Documents disseminated in connection with the Reorganization and IPO, pursuant to which Plaintiffs and the Class purchased or acquired shares of ICG common stock, were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed adequately to disclose material facts as described above.

87. The Company is the registrant for the ICG common stock sold in the Reorganization and IPO. As the issuer of these common shares, ICG is strictly liable, without proof of fault, to Plaintiffs and the other members of the Class who purchased ICG's stock in or traceable to the IPO Documents for the misstatements and omissions contained therein under §11 of the Securities Act.

88. The Individual Defendants signed the IPO Documents and were responsible for their contents and dissemination. As signatories, the Individual Defendants are strictly liable to Plaintiffs and the other members of the Class for the material misstatements in and omissions from the IPO Documents, subject to a due diligence defense which Defendants cannot meet.

89. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Documents were true, without omissions of any material facts. Defendants issued and participated in the dissemination of

materially false and misleading written statements to the investing public that were contained in the IPO Documents. By reason of the conduct herein alleged, each defendant violated §11 of the Securities Act.

90. Plaintiffs and the other members of the Class who purchased ICG stock in or traceable to the IPO Documents sustained damages. At the time they purchased or acquired their shares, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the inaccurate and misleading statements and omissions alleged herein. As a direct and proximate cause of defendants' wrongful conduct, Plaintiffs and members of the Class suffered substantial damages in connection with their purchase of ICG stock pursuant and/or traceable to the Reorganization and IPO.

91. The Underwriter Defendants underwrote the ICG shares sold in the December 2005 IPO as defined in §11(a)(5) of the Exchange Act.

92. As underwriters of the December 2005 offering, the Underwriter Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the December 2005 IPO Documents at the time they became effective, to ensure that said statements were not misleading and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants did not make a reasonable and diligent investigation nor did they possess reasonable grounds for the belief that the statements contained in the December 2005 IPO Documents at the time they became effective were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. As such, the Underwriter Defendants are liable to Plaintiffs and the Class.

## SECOND COUNT

**For Violations of Section 12(a)(2) of The Securities Act Against All Defendants**

93. Plaintiffs incorporate each of the foregoing allegations set forth in ¶¶1-84 above as if fully set forth herein, except to the extent that such allegations charge Defendants with intentional or reckless misconduct. For the purposes of this Count, Plaintiffs expressly disavow any allegation that any defendant acted with scienter or fraudulent intent, which is not an element of a Securities Act clam.

94. This Count is brought pursuant to §12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

95. Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectuses. Defendants issued, caused to be issued, and/or signed the Registration Statements in connection with the Reorganization and IPO. The Registration Statements contained Prospectuses which were used to induce investors, such as Plaintiffs and the other members of the Class, to purchase ICG common stock.

96. The Prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectuses. ICG, acting through its employees, agents and others, solicited such purchases for its personal financial gain through the preparation and dissemination of the Prospectuses.

97. ICG, its employees and agents, and the Individual Defendants owed Plaintiffs and members of the Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no

omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care by their employees and agents should have known of, the misstatements and omissions contained in the IPO Documents, including the Prospectuses, as set forth above.

98. Plaintiffs and other members of the Class purchased or otherwise acquired ICG common stock pursuant to and/or traceable to the defective November 2005 Prospectus and December 2005 Prospectus. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

99. By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who hold ICG common stock purchased in the Reorganization and/or IPO have the right to rescind and recover the consideration paid for their ICG common stock and hereby elect to rescind and tender their ICG common stock to defendants sued herein in return for the consideration paid for those securities together with interest thereon. Plaintiffs and Class members who have sold their ICG common stock are entitled to rescissory damages.

## THIRD COUNT

### For Violations of Section 15 of the Securities Act Against Individual Defendants and ICG

100. Plaintiffs incorporate each of the foregoing allegations set forth in ¶¶1-84 above as if fully set forth herein, except to the extent that such allegations charge defendants with intentional or reckless misconduct. For the purposes of this Count, Plaintiffs expressly disavow any allegation that any defendant acted with scienter or fraudulent intent, which is not an element of a Securities Act claim.

101. The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act at the time the Registration Statements and Prospectuses became effective and during the Reorganization and IPO. At the time the Registration Statements and Prospectuses were filed with the SEC and declared effective, the Individual Defendants had the power and authority to control the Company by reason of their positions at ICG, as set forth in ¶¶8-18.

102. As a result of the foregoing, Plaintiffs and members of the Class suffered damages and the Individual Defendants and ICG are jointly and severally liable for the alleged violations of §15 of the Securities Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of members of the Class, pray for judgment as follows:

(a) Declaring this action to be a class action properly maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class, and declaring Plaintiffs to be proper Class representatives;

(b) Awarding Plaintiffs and members of the Class compensatory damages as a result of the wrongs complained of herein, including interest thereon;

(c) Awarding Plaintiffs and members of the Class their costs and expenses of this litigation, including reasonable attorneys' and expert witness fees and other costs and disbursements; and

(d) Awarding Plaintiffs and members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: August 24, 2007.

Respectfully submitted,

**LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**
JACK REISE
DOUGLAS WILENS
MICHAEL GREENWALD

By: */s/ Douglas Wilens*___________
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33433
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@lerachlaw.com
dwilens@lerachlaw.com
mgreenwald@lerachlaw.com

***Lead Counsel for the Class***

**CARBONE & BLAYDES, P.L.L.C.**
MARK W. CARBONE #6291
2442 Kanawha Boulevard East
Charleston, WV 25311
Telephone: 304/342-3650
304/342-3651 (fax)
wvjustice@aol.com

***Liaison Counsel for the Class***

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

| | |
|---|---|
| CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ICG, INC. a/k/a INTERNATIONAL COAL GROUP, INC., WILBUR L. ROSS, JR., JON R. BAUER, CYNTHIA B. BEZIK, WILLIAM J. CATACOSINOS, BENNETT K. HATFIELD, MARCIA L. PAGE, WENDY L. TERAMOTO, WILLIAM D. CAMPBELL, UBS INVESTMENT BANK and LEHMAN BROTHERS,<br><br>Defendants. | No. 2:07-0226 |

**CERTIFICATE OF SERVICE**

I, DOUGLAS WILENS, DO HERBY CERTIFY THAT ON AUGUST 24, 2007, I ELECTRONICALLY FILED THE "**AMENDED CLASS ACTION COMPLAINT**" WITH THE CLERK OF THE COURT USING THE CM/ECF SYSTEM, WHICH WILL SEND NOTIFICATION OF SUCH FILING TO THE FOLLOWING:

Nancy A. Kulesa, Esquire
Jeffrey S. Noble, Esquire
Schatz Nobel Izard, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103

Steven F. White, Esquire
Steven F. White, PLLC
405 Capitol Street, Suite 908
Charleston, WV 25301

Edward McDevitt, Esquire
Bowles, Rice, McDavid, Graff & Love, LLP
Post Office Box 1386
Charleston, WV 26325

Robert C. Micheletto, Esquire
Bronson J. Bigelow, Esquire
Jones Day
222 East 41st Street
New York, New York 10017

John M. Newman, Jr., Esquire
Jones Day
901 Lakeside Avenue, North Point
Cleveland, OH 44110

John R. Hoblitzell, Esquire
Kay, Casto & Chaney, PLLC
1500 Chase Tower
707 Virginia Street, East
Charleston, WV 25327-2031

James K. Lehman, Esquire
Cory E. Manning, Esquire
Nelson, Mullins Riles & Scarborough, LLP
Meridian, 17th Floor
1320 Main Street
Columbia, SC 29201

Troy N. Giatras, Esquire
The Giatras Law Firm
118 Capital Street, Suite 400
Charleston, WV 25301

Jeffrey R. Krinsk, Esquire
Mark L. Knuston, Esquire
William R. Restis, Esquire
Finkelstein & Krinsk, LLP
501 West Broadway, Suite 1250
San Diego, CA 92101-3579

Matthew P. Montgomery, Esquire
Darrin J. Robbins, Esquire
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

By: */s/ Douglas Wilens*
**LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33433
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@lerachlaw.com
dwilens@lerachlaw.com
mgreenwald@lerachlaw.com

***Lead Counsel for the Class***