UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


CITY OF ANN ARBOR EMPLOYEES'
RETIREMENT SYSTEM and
AIP ALTERNATIVE STRATEGIES FUNDS -
ALPHA HEDGED STRATEGIES FUND,
On Behalf of Themselves
and All Others Similarly Situated,

      Plaintiffs,

v.                                        Civil Action No. 2:07-0226

ICG, INC. a/k/a INTERNATIONAL
COAL GROUP, INC., WILBUR L. ROSS, JR.,
JON R. BAUER, CYNTHIA B. BEZIK,
WILLIAM J. CATACOSINOS,
BENNETT K. HATFIELD, MARCIA L. PAGE,
WENDY L. TERAMOTO, WILLIAM D. CAMPBELL,
UBS INVESTMENT BANK and LEHMAN BROTHERS,

      Defendants.


MEMORANDUM OPINION AND ORDER


Pending, inter alia, are the motion to dismiss of

defendants UBS Investment Bank and Lehman Brothers (collectively

"underwriter defendants"); and the motion to dismiss of

defendants Wilbur L. Ross, Jr., Jon R. Bauer, Cynthia B. Bezik,

William J. Catacosinos, Bennett K. Hatfield, Marcia L. Page,

Wendy L. Teramoto, William D. Campbell, and ICG, Inc.

(collectively "ICG defendants"), each filed September 28, 2007.

The motions to dismiss are based upon, among other things, the

statute of limitations.[1]

## I.  Facts Alleged in the Complaint

### A.  Background

The individual defendants served as officers or directors of International Coal Group, Inc.  (Am. Compl. ¶¶ 8-15).  Having developed a reputation for purchasing and consolidating distressed businesses, one of these individuals, Wilbur L. Ross, Jr. ("Ross"), saw potential in the coal mining industry and, in particular, in Anker Coal Group, Inc. ("Anker"), a financially-distressed coal company with rights to significant coal deposits.  (Id. ¶¶ 31-32).  Beginning in 1999, Ross amassed control over Anker's operations by accumulating 47% of its preferred stock and $37.3 million of its debt, obtaining one of four seats on its board of directors, and installing his long-

---

[1]  It is ORDERED that the motion of the ICG defendants, filed September 28, 2007, and the motion of the lead plaintiffs, filed October 9, 2007, to exceed the page limitations in their respective submissions be, and they hereby are, granted.  Also pending is the motion of the lead plaintiffs, filed on October 19, 2007, for oral argument on the motions to dismiss.  Inasmuch as the issues were adequately presented in the written submissions, it is ORDERED that the motion for oral argument be, and it hereby is, denied.

2

time associate, Wendy Teramoto, as chairperson of Anker's board. (Id. ¶¶ 31-33).

In May 2004, Ross's investment firm, WL Ross & Co. LLC, united with other investors to form International Coal Group, Inc. ("ICG") to acquire and consolidate various coal mining facilities. (Id. ¶ 34). In September 2004, ICG paid nearly $300 million to acquire key assets of Horizon NR, LLC, a financially-distressed coal mining company which had filed for bankruptcy twice in 2002. (Id. ¶ 36). On March 31, 2005, ICG entered into agreements with Anker and CoalQuest Development, LLC ("CoalQuest"), another regional coal producer and Anker subsidiary, in a stock-for-stock transaction through which the stockholders of Anker and the members of CoalQuest received shares of ICG common stock. (Id. ¶ 37).

B. ICG is Formed Through Corporate Reorganization

ICG structured the acquisitions of Anker and Coalquest as a holding company reorganization through which shares of the "old" pre-reorganization ICG stock would be swapped for shares of the "new" post-reorganization ICG stock in a one-for-one tax-free exchange. (Id. ¶ 38). "Through this reorganization, ICG would

become the top-tier parent holding company and the old ICG, Anker
and Coalquest would become its wholly-owned subsidiaries."
(Id.).

In connection with the reorganization, ICG issued a
registration statement and prospectus, which offered shareholders
a choice between exchanging the old shares for new shares or
exercising appraisal rights to obtain fair market value for the
old shares.  (Id. ¶ 56).  The registration statement and
prospectus included representations regarding ICG's commitment to
mine safety and maintenance, the operational movements
attributable to Anker that had significantly improved recent
operating performance, and expectations for the Sago mine in West
Virginia.  (Id. ¶¶ 59-61).  On November 18, 2005, ICG completed
the reorganization and acquired Anker and Coal Quest.  On
November 21, 2005, ICG's stock began trading on the New York
Stock Exchange.  (Id. ¶ 64).[2]

---

[2] Prior to the reorganization, the "old ICG" was named
International Coal Group, Inc.  To facilitate the reorganization,
the old International Coal Group, Inc. changed its name to ICG,
Inc.  The corporation for which the individual defendants served
as officers and directors, referred to as the "new ICG," adopted
the name International Coal Group, Inc.  (Reorganization
Registration Statement, Newman Decl., ex. 2).  Through the
reorganization, International Coal Group, Inc. (ICG) became the
top-tier parent holding company for ICG, Inc.  As noted by the
individual defendants, plaintiffs, quite understandably, confused
International Coal Group, Inc. with ICG, Inc. and incorrectly

## C. ICG's Initial Public Offering

The newly-reorganized ICG raised capital through its initial public offering ("IPO") in which it issued another registration statement and prospectus.  (Id. ¶ 65).  The IPO registration statement and prospectus touted ICG's "excellent safety record," emphasized that ICG's "focus" on safety and safe operating practices "leads to higher productivity and improved financial performance," and stated its industry "leadership in safety and environmental performance."  (Id. ¶¶ 68-71).  On December 12, 2005, ICG completed its successful IPO, selling 21 million shares of stock at $11.00 per share.  (Id. ¶ 74).

## D.  The Allegedly Materially False and Misleading Representations of the Registration Statements and Prospecti

City of Ann Arbor Employees' Retirement System ("Ann Arbor") and AIP Alternative Strategies Funds - Alpha Hedged Strategies Fund ("AIP") (collectively "lead plaintiffs") allege

---

named ICG, Inc. as the corporate defendant in this action.  The individual defendants, however, have proceeded as if International Coal Group, Inc. was properly named.  (ICG Defs.' Memo. in Supp. of M.T.D. at 1 n.1).

that, despite the glowing statements in the registration statements and prospecti, ICG was not operating its mines in a safe manner at the time of the reorganization and the IPO.  (Id. ¶ 39).  It is further alleged ICG was more focused on increasing coal production and maximizing profits than on safety.  (Id.).  Throughout 2005, ICG received numerous citations for safety violations.  (Id. ¶¶ 40-55).  The violations, contrary to ICG's disclosures, are said to have exceeded industry averages and adversely impacted operations at a number of ICG mines, including the Sago mine in West Virginia, through increased governmental inspections and enforcement.  (Id. ¶¶ 44, 49-55).

### E. The Sago Mine Disaster and its Aftermath

On January 2, 2006, just weeks after completion of the IPO, there was an underground explosion at the Sago mine.  The explosion left twelve miners dead and another with serious injuries.  (Id. ¶ 75).  In the days following the tragedy, "an avalanche of media accounts" discussed numerous citations for safety violations committed by ICG for Sago and other mines.  (Id. ¶¶ 76-77).

Between January 3 and 24, 2006, the defendants note

6

that articles regarding ICG's safety record appeared on the <u>NBC Nightly News</u> and in the following periodicals:  <u>Wall Street Journal</u>, <u>Washington Post</u>, <u>Christian Science Monitor</u>, <u>Charleston Gazette</u>, <u>Newsweek</u>, <u>Chicago Tribune</u>, <u>Pittsburgh Post Gazette</u>, and <u>New York Times</u>.[3]  (Newman Decl. Exs. 5-14).  Another such media account was a <u>USA Today</u> article published on January 4, 2006, which "analyzed Sago's safety record [and] found that the ICG mine had far more violations and far more accidents than other comparable mines."  (Am. Compl. ¶ 49).

In order to neutralize any adverse market reaction to these news reports, ICG issued positive press releases, including one on January 23, 2006, which, <u>inter</u> <u>alia</u>, quoted ICG's president and CEO, Bennett K. Hatfield ("Hatfield"), as saying, in part, that, "the safety record at the Sago Mine demonstrates that our management team aggressively focused on mine safety." (Am. Compl. ¶¶ 12, 76-77).  Yet, shortly thereafter, "ICG suggested that its safety record was not as 'excellent' as previously disclosed.  On February 1, 2006, ICG announced that all of its mines and shipping facilities would 'begin each shift with a special in-depth safety review.'"  (<u>Id.</u> ¶ 77).  "By March

---

[3]  Lead plaintiffs have not disputed the accuracy of the materials submitted or the appropriateness of the court's consideration of the media reports.

7

1, 2006, the price of ICG had declined to $8.45 per share -- over 23% below the IPO price." (Id. ¶ 78).

On June 6, 2006, ICG issued a press release lowering its financial outlook and attributed this reduced earnings projection in material part to "an unprecedented number of operating challenges." (Id. ¶ 80). On June 8, 2006, in a conference call with investors, Hatfield admitted that inspections and governmental oversight had increased but stated that the impact of such an increase was hard to measure in specific dollars. (Id. ¶ 81). The June revelations caused the price of ICG stock to drop again. (Id. ¶ 82). On September 12, 2006, the company lowered its financial outlook for 2006 based on the events at Sago and a fire at its Viper mine in Illinois, which caused another precipitous decline in ICG's stock price. (Id. ¶¶ 80, 82-83).

The results of multiple investigations of the Sago mine disaster have since been publicly released. (Id. ¶ 84). While the reports came to different conclusions, the plaintiffs contend the reports uniformly found ICG's safety record to have been much worse than portrayed in documents disseminated in connection with

8

the reorganization and IPO.[4]  (Am. Compl. ¶ 84).  As such, plaintiffs contend that the defendants' should be held liable.

The lead plaintiffs allege the underwriter defendants, while undertaking the required investigation in assisting and planning the IPO, had access to the information being misrepresented or omitted by the defendants and are thus liable for the adverse consequences.  (Id. ¶¶ 19-20).

II.

On April 5, 2007, this securities fraud class action was filed by Ann Arbor, AIP, and the Iron Workers of Western Pennsylvania Pension Plan on behalf of themselves and others similarly situated ("Ann Arbor action").  The amended class action complaint alleges violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o), and is brought pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1 et seq., which allows private class actions to enforce the

_____

[4]  One report, issued by the Mine Safety and Health Administration (MSHA) on May 9, 2007, concluded that "[l]ightning was the most likely ignition source" of the explosion.  (MSHA report, Newman Declar., ex. 15).

9

Securities Act of 1933.  The allegations are that ICG, its officers and directors, and its underwriters for the stock offerings violated securities laws by filing documents with the SEC concerning ICG's November 2005 reorganization and December 2005 IPO that contained numerous misrepresentations regarding the true state of ICG's coal mining operations.

### A.  Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 127 S. Ct. at 1969)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).  Additionally, the showing of an "entitlement to

10

relief" amounts to "more than labels and conclusions . . . ."
<u>Twombly</u>, 127 S. Ct. at 1965.  It is now settled that "a formulaic
recitation of the elements of a cause of action will not do." <u>Id.</u>

The complaint need not, however, "make a case" against
a defendant or even "forecast evidence sufficient to prove an
element" of the claim.  <u>Chao v. Rivendell Woods, Inc.</u>, 415 F.3d
342, 349 (4th Cir. 2005) (quoting <u>Iodice v. United States</u>, 289
F.3d 270, 281 (4th Cir. 2002)).  Instead, the opening pleading
need only contain "[f]actual allegations . . . [sufficient] to
raise a right to relief above the speculative level." <u>Twombly</u>,
127 S. Ct. at 1965.  Stated another way, the complaint must
allege "enough facts to state a claim to relief that is plausible
on its face." <u>Id.</u> at 1974.

Application of the Rule 12(b)(6) standard also requires
that the court "'accept as true all of the factual allegations
contained in the complaint . . . .'" <u>Erickson v. Pardus</u>, 127 S.
Ct. 2197, 2200 (2007) (quoting <u>Twombly</u>, 127 S. Ct. at 1965; <u>see
also</u> <u>South Carolina Dept. Of Health And Environmental Control v.
Commerce and Industry Ins. Co.</u>, 372 F.3d 245, 255 (4th Cir. 2004)
(quoting <u>Franks v. Ross</u>, 313 F.3d 184, 192 (4th Cir. 2002)).  The
court is additionally required to "draw[] all reasonable . . .
inferences from those facts in the plaintiff's favor . . . ."

Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

## B. Statute of Limitations

The one-year statute of limitations for §§ 11 and
12(a)(2) claims is set forth in section 13 of the 1933 Act which
reads in part: "No action shall be maintained to enforce any
liability created under [Section 11 or Section 12(a)(2)] unless
brought within one year after the discovery of the untrue
statement or the omission, or after such discovery should have
been made by the exercise of reasonable diligence . . . ." 15
U.S.C. § 77m.  In addition to §§ 11 and 12(a)(2) claims, the
plaintiffs also pled a § 15 claim.  Because "Section 15 merely
creates a derivative liability for violations of Sections 11 and
12, Section 13 applies to it as well."  Dodds v. Cigna
Securities, Inc., 12 F.3d 346, 350 (2d Cir. 1993) (citing Herm v.
Stafford, 663 F.2d 669, 679 (6th Cir. 1981)); accord In re USEC
Secs. Litig., 190 F. Supp.2d 808, 815 (D. Md. 2002).  As the ICG
defendants point out, the lead plaintiffs do not contest that the
relevant statute of limitations embodied in section 13 of the
Securities Act for all three claims is one year.  (ICG Defs.'
Reply to Resp. to M.T.D. at 2-3; Lead Pls.' Resp. to M.T.D.'s at
24-26).

12

The statute of limitations begins to run when the fraud is discovered or should have been discovered by the exercise of due diligence.  Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir. 1993).  A plaintiff in a federal securities case is deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. Dodds, 12 F.3d at 350.  "The objective standard of due diligence requires reasonable investigation of the possibility of misrepresentation once an individual has been placed on inquiry notice of wrongdoing."  Brumbaugh, 985 F.2d at 162 (citing Fox v. Kane-Miller Corp., 542 F.2d 915, 917 (4th Cir. 1976)).  Recently, in a securities fraud case, our court of appeals concluded:

> There is a place for finality in the law.  Defendants are prejudiced when "[m]emories fade, documents are lost, [and] witnesses become unavailable."  Brumbaugh, 985 F.2d at 162. And defendants are entitled to "the security of knowing when legal action against [them] has been foreclosed." Id.  There was a time when these claims could and should have been fairly adjudicated, but that time has long passed.

GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 180 (4th Cir. 2007).

Discovery of facts constituting the alleged misrepresentations or omissions may arise from actual notice,

13

constructive notice, or inquiry notice.  USEC, 190 F. Supp. at 816 (citing Dodds, 12 F.3d at 350).  Both sets of defendants assert plaintiffs were on inquiry notice more than one year prior to the filing of the lawsuit.  (Undwr. Defs.' Memo. in Supp. of M.T.D. at 7-8; ICG Defs.' Memo. in Supp. of M.T.D. at 10-12).

"Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam.  Merely bringing suit after the scheme has been laid bare through the efforts of others . . . will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss."  Brumbaugh, 985 F.2d at 162 (internal citations omitted).  In emphasizing that the "possibility" of fraud was sufficient to invoke the running of the statute, our court of appeals has stated, "[c]ommencement of a limitations period need not . . . await the dawn of complete awareness."  Id.

Facts that put plaintiffs on inquiry notice are often revealed in communications that are commonly referred to as "storm warnings."  DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 216 (3rd Cir. 2007) (internal citations omitted); Dodds, 12 F.3d at 350; Cook v. Avien, Inc., 573 F.2d 685, 697-698 (1st Cir. 1978).  The District Court of Maryland has described a storm warning as "any indication in a communication issued

14

subsequent to the prospectus 'that could reasonably be considered contrary to the rosy predictions that the plaintiffs claim were misrepresentations.'"  USEC, 190 F. Supp.2d at 818 (citing Harner v. Prudential Secs., Inc., 785 F. Supp. 626, 632 (E.D. Mich. 1992), aff'd. 35 F.3d 565 (6th Cir. 1994)).  The Second Circuit has also found that a storm warning "'must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'"  Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) (internal citations omitted).

Storm warnings sufficient to demonstrate inquiry notice can be established by the dissemination of "financial, legal or other data, including public disclosures in the media" regarding the condition of a corporation.  USEC, 190 F. Supp.2d at 821 (internal citations omitted).

Where the underlying facts are undisputed, the issue of whether the plaintiff has been put on inquiry notice can be decided as a matter of law.  Brumbaugh, 985 F.2d at 162 (citing Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987)).  The lead plaintiffs contend the defendants "bear a 'heavy burden' in establishing that the plaintiff was on inquiry notice as a matter of law."  Nivram Corp. v. Harcourt Brace

15

Jovanovich, Inc., 840 F. Supp. 243, 249 (S.D.N.Y. 1993) (quoting

Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 859

(S.D.N.Y. 1991)).  The Southern District of New York explained

this heavy burden can be met "only when 'uncontroverted evidence

irrefutably demonstrates when plaintiff discovered or should have

discovered the fraudulent conduct.'"  Id. (internal citations

omitted).

        This action was filed on April 5, 2007.  If the

undisputed facts demonstrate that a reasonable shareholder would

be on inquiry notice prior to that date and would have discovered

or should have discovered the fraud by the exercise of due

diligence before April 5, 2006, the claims are barred by the

statute of limitations.[5]

        In their memoranda, both the underwriter defendants and

ICG defendants point to a series of events beginning with the

_____

        [5] According to the lead plaintiffs, the defendants cannot
"have it both ways" inasmuch as defendants have "steadfastly
maintained . . . that they have not made any untrue statements or
omissions" while arguing alternatively that plaintiffs discovered
or should have been aware of misrepresentations and omissions
more than one year prior to filing of this action.  (Lead Pls.'
Resp. to M.T.D.'s at 25).  As footnote 3 of the ICG defendants'
reply indicates, however, Rule 8(e)(2) of the Federal Rules of
Civil Procedure allows defendants to "state as many separate . .
. defenses as the party has regardless of consistency . . . .
Fed. R. Civ. P. 8(e)(2).

16

Sago mine disaster on January 2, 2006.  So, too, do the

plaintiffs in the following four paragraphs pled in the amended

complaint:

49.  Overall, ICG's Sago mine's safety record compared
     poorly to other similarly sized mines in West Virginia.
     A January 4, 2006 article in *USA Today* that analyzed
     Sago's safety record found that the ICG mine had far
     more violations and far more accidents than other
     comparable mines.  In fact, Sago had 40 accidents in
     2005 alone, compared to maximum of 12 accidents at the
     mines used in *USA Today's* analysis.

                          * * * *

76.  The tragedy at Sago led to a proliferation of news
     reports which disclosed and detailed the Company's
     poor safety record at many of its mines.  As news
     of widespread safety violations and government
     investigations trickled into the market after Sago
     and through February 2006, ICG attempted to
     counteract the market's fears about its safety
     record and support the price of ICG stock with
     several positive press releases.  For example, on
     January 23, 2006, ICG issued a press release
     entitled "International Coal Joins Senate Effort
     to Improve Mine Safety" which described Hatfield's
     testimony before a U.S. Senate Appropriations
     Subcommittee concerning his assurances that the
     Sago mine disaster "will lead to improvements
     throughout the industry."  The press release
     further quoted Hatfield: "While the tragic events
     of January 2 confirm that we must be ever vigilant
     on mine safety, the safety record at the Sago mine
     demonstrates that our management team aggressively
     focused on mine safety."

77.  However, amid an avalanche of media accounts
     documenting its hundreds of safety violations, ICG
     suggested that its safety record was not as
     'excellent' as previously disclosed.  On February
     1, 2006, ICG announced that all of its mines and
     shipping facilities would 'begin each shift with a

                            17

special in-depth safety review.'  The Company
further announced:

> This procedure will include not only
> West Virginia operations, but also
> those in Kentucky, Illinois, and
> Maryland.
>
> Mine managers will discuss safety
> issues presented in each of the fatal
> accidents that have occurred in West
> Virginia, which will include risks
> associated with roof and rib control,
> belt fires, operating equipment in
> close proximity to gas wells -- and
> will specifically reinforce mine
> evacuation plans.

78. By March 1, 2006, the price of ICG had declined to
$8.45 per share -- over 23% below the IPO price.

(Am. Compl. ¶¶ 49, 76-78).

It is also observed that, as noted by the defendants,
between January 3 and 24, 2006, articles detailing ICG's
problematic safety record appeared in the following periodicals:
The Wall Street Journal, Washington Post, The Christian Science
Monitor, Charleston Gazette, Newsweek, Chicago Tribune,
Pittsburgh Post Gazette, and The New York Times.  (Newman Decl.
Exs. 6-14).

The underwriter defendants characterize the Sago mine
disaster, the USA Today article, and the general avalanche of
media reports regarding ICG's unfavorable safety record as storm

warnings sufficient to put shareholders on inquiry notice of the possibility that the registration statements and prospecti contained misrepresentations or omissions regarding the safety record of ICG's mines.  (Uwr. Defs.' Memo. in Supp. of M.T.D. at 8).  The ICG defendants contend that the lead plaintiffs do not "dispute that, by February 1, 2006, at the very latest, plaintiffs were on notice of the allegedly poor safety record at ICG's mines, owing to the 'avalanche of media accounts documenting [ICG's] hundreds of safety violations' that appeared immediately following the Sago mine incident in January 2006." (ICG Defs.' Reply to Resp. to M.T.D. at 2-3, citing Am. Compl. ¶ 77).  Based on paragraphs 76 and 77 of the amended complaint, it appears that sometime around February 1, 2006, "ICG suggested that its safety record was not as 'excellent' as previously disclosed."  (Am. Compl. ¶¶ 76-77).

        The lead plaintiffs respond that the defendants misconstrue the nature of their claims.  (Lead Pls.' Resp. to M.S.J.'s at 26).  According to Ann Arbor and AIP, their claim focuses on "the link between safety and financial performance that was relevant and material to investors."  (Id.).  With this link in mind, the lead plaintiffs contend "the various news reports discussing ICG's poor safety record, on the heels of the

Sago mine disaster, were not sufficient 'storm warnings' of
actionable misstatements because 'a reasonable investor of
ordinary intelligence' would not have surmised that safety issues
were adversely impacting the Company's bottom line."  (Id.).

It is fair to conclude, however, that a reasonable
investor would have realized that safety issues were negatively
affecting the stock's value.  Between paragraphs 74 and 75 of the
amended complaint, the lead plaintiffs' subheading demonstrates
the obvious connection with the following in boldface print:
"Fallout From Revelations of Widespread Safety Violations at ICG
Mines Causes the Price of ICG Stock to Decline."  (Am. Compl. at
22).  According to the plaintiffs, these revelations occurred
well before June 6, 2006, the date plaintiffs contend the statute
of limitations began to run.  Plaintiffs state that the tragedy
at Sago led to a "proliferation of news reports which disclosed
and detailed the Company's poor safety record at many of its
mines."  (Id. ¶ 76).  This proliferation of reports, according to
the plaintiffs, led ICG to issue a press release on January 23,
2006 in "an attempt to counteract the market's fears about its
safety record and support the price of ICG stock."  (Id.).
Further, plaintiffs state that "amid an avalanche of media
accounts documenting its hundreds of safety violations, ICG

suggested its safety record was not as 'excellent' as previously disclosed," and on February 1, 2006 announced "all of its mines and shipping facilities would 'begin each shift with a special in-depth safety review."   (<u>Id.</u> ¶ 77).

As the ICG defendants state, the link between ICG's safety record and its financial performance "requires no great intellectual leap."  (ICG's Defs.' Reply to Resp. to M.T.D. at 5).  The link can certainly be imputed under the reasonable investor standard.  <u>See</u> <u>Greenhouse v. MCG Capital Corp.</u>, 392 F.3d 650, 656 (4th Cir. 2004) ("It is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing."); <u>Hillson Partners L.P. v. Adage, Inc.</u>, 42 F.3d 204, 213 (4th Cir. 1994) (courts need not ascribe "childlike simplicity" to reasonable investor). In fact, following plaintiffs' description of the "proliferation of news reports" and "avalanche of media accounts" documenting ICG's "poor safety record" and "hundreds of safety violations," the plaintiffs' state that "[b]y March 1, 2006, the price of ICG had declined to $8.45 per share - over 23% below the IPO price." (Am. Comlp. ¶ 78).  Following the publicity documenting ICG's poor safety record, a reasonable investigation was required of

21

plaintiffs, including a review of the registration statements and prospecti, which form the basis of this litigation.  See Brumbaugh, 985 F.2d at 162 (citing Fox, 542 F.2d at 917).

The ICG defendants point to portions of the prospecti, which they contend demonstrated the link between a poor safety record and the value of the company's stock.  (ICG's Defs.' Reply to Resp. to M.T.D. at 5).  One portion of the IPO prospecti, highlighted by the lead plaintiffs, supports the ICG defendants' position inasmuch as it stated that ICG's "focus on safety . . . results in reduced likelihood of disruption of production at our mines, which leads to higher productivity and improved financial performance."  (ICG Defs.' Reply to Resp. to M.T.D. at 5; Lead Pls.' Resp. to M.T.D.'s at 25).  An additional excerpt from the prospecti underscores the link with the following:

> Failure to comply with these [safety and health] regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of cleanup and site restoration costs and liens, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from our operations . . .

(Newman Decl. Ex. 2 at 19, Ex. 3 at 27).

The media accounts are another source which established the link between ICG's unflattering safety record and the

22

company's financial position.  The January 4, 2006 USA Today
article cited in paragraph 49 of the amended complaint, detailed
the "hundreds of federal safety violations" at the Sago mine.
(Am. Compl. ¶ 49).  The USA Today article noted that, in 2004 and
2005, "the government sought $33,600 in fines.  Of that, the
companies paid $23,986."  (Newman Decl. Ex. 4).  The article
further reported that parts of the Sago mine had been closed by
MSHA eighteen times in 2005.  (Id.).  Similarly, a Washington
Post article of January 4, 2006, entitled "Safety Violations Have
Piled Up At Coal Mine" reported that ICG agreed to pay the nearly
$24,000 in penalties to settle violations at the Sago mine.
(Newman Decl. Ex. 7).

        Based on the apparent and obvious link between the
well-publicized problems ICG had with safety and its declining
financial performance, which the lead plaintiffs recognized in a
heading in their amended complaint, and based on the
representations in the prospecti and the media accounts, the
court rejects the lead plaintiffs' argument that a reasonable
investor would not have surmised that the Sago mine disaster and
the ensuing scrutiny raising the issues regarding ICG's
questionable safety record would not seriously and adversely
affect the value of ICG's stock.

The lead plaintiffs use the date of June 6, 2006 --
when ICG announced it lowered its financial outlook as a result
of "an unprecedented number of operating challenges," (Am. Compl.
¶ 80) -- as the date investors were on notice of the connection
between the safety issues and the declining financial performance
causing the precipitous drop in ICG's stock price.  (Lead Pls.'
Resp. to M.S.J.'s at 26-27).  Even assuming plaintiffs' linkage
theory could somehow pass muster, the operative date the statute
would begin to run would be no later than March 1, 2006, rather
than June 6, 2006.  The amended complaint alleges that the stock
price had fallen 23% by March 1, 2006, more than one year prior
to the filing of this action.  (Am. Compl. ¶ 78).

Defendants need only show evidence sufficient to
constitute a storm warning or that plaintiffs were on notice of
the possibility of fraud prior to April 5, 2006.  "Even a single
news article can provide sufficiently strong omens to place a
plaintiff on notice of the need for investigation."  In re
Zyprexa Prods. Liab. Litig., 548 F. Supp. 2d 496, 534 (E.D.N.Y.
2008).  By plaintiffs' own admission, there had been, prior to
March 1, 2006, a "proliferation" or "avalanche" of news reports
and media accounts exposing ICG's poor safety record.  (Am.
Compl. ¶¶ 76-78).  A reasonable investor would have observed the

possibility that the concerns over ICG's safety issues contributed to the declining value of the stock in advance of April 5, 2006, due to the storm warnings that have been identified.

Citing In re Pronetlink Secs. Litig., 403 F. Supp. 2d 330, 334-335 (S.D.N.Y. 2005) and Milman v. Box Hill Systems, Corp., 72 F. Supp.2d 220, 229 (S.D.N.Y. 1999), the lead plaintiffs tersely contend that ICG's efforts to "counteract the negative publicity with a series of press releases extolling their safety record and commitment to safety" further offset the avalanche of media accounts. (Lead Pls.' Resp. to M.S.J.'s at 26).

In the Second and Third Circuits, "[r]eassurances can dissipate apparent storm warnings 'if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns.'" Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Management L.P., 435 F.3d 396, 402 n. 16 (3rd Cir. 2006) (quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 169 (2d Cir. 2005)); accord DeBenedictis, 492 F.3d at 218 (quoting LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003)) ("However, reassuring statements will prevent the emergence of a duty to inquire or

25

dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern.").

While the Second Circuit has required that discoverable information indicate to a reasonable investor the probability of misfeasance, see Newman, 335 F.3d at 193, our court of appeals' pronouncement in Brumbaugh made it clear that inquiry notice of the possibility of the alleged wrongdoing was sufficient to trigger running of the statute of limitations.  985 F.2d at 162. Indeed, "as soon as . . . [plaintiffs were] apprised of the possibility of fraud, they were under a duty to investigate any misrepresentations."  Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1263 (4th Cir. 1993).

It is thus logical that the equitable estoppel principles in the form of the reassuring statements given credence in the Second and Third Circuits have been read into federal securities laws in the Fourth Circuit "only where a defendant has misled a plaintiff, causing that plaintiff to delay filing a viable suit until after that suit becomes barred by a statute of limitations. . . . [and] is typically applied where a defendant has misrepresented to a plaintiff his legal rights . . . or has used settlement negotiations to induce delay . . . ."

Caviness v. Derand Resources Corp., 983 F.2d 1295, 1302 (4th Cir.
1993). Such is not the case here. The Fourth Circuit Court of
Appeals has further explained, "[f]raud by its nature is
something perpetrators take pains to disguise, and plaintiffs'
notion that allegedly concealed fraud excuses the need for any
diligence on plaintiffs' part would permit statutory periods to
be tolled indefinitely, even when plaintiffs could reasonably be
expected to bring suit." GO Computer, 508 F.3d at 179.

The lead plaintiffs point to statements in ICG's press
releases dated January 23, 2006, (Am. Compl. ¶ 76), March 15,
2006, and April 27, 2006, (Exs. A and B to Lead Pls.' Resp. to
M.T.D.'s). The allegedly reassuring statements in those press
releases pale in comparison to the overwhelming evidence of ICG's
problematic safety record. That evidence was brought to light,
in part, by the deluge of media accounts between January 2 and
24, 2006, documenting ICG's "hundreds of safety violations" prior
to the Sago disaster. (Lead Pls.' Resp. to M.T.D's at 26; Am.
Compl. ¶ 77). The reasonable investor would not have found that
the possible existence of misrepresentations in the prospecti and
other documents was extinguished by the ICG press releases and

the statements of ICG's officer, Ben Hatfield, embedded therein.[6]

Even under the more lenient standard employed by the Second and Third Circuits, lead plaintiffs' claim would be barred.  In those circuits, the test of "[w]hether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence."

---

[6] In pertinent part, the portion of the January 23, 2006 press release quoted by the plaintiffs states, "the safety record at the Sago Mine demonstrates that our management team aggressively focused on mine safety."  (Am. Compl. ¶ 76).  As asserted in the following paragraph of plaintiffs' complaint, this statement was clearly belied by the "avalanche of media accounts documenting its [ICG's] hundreds of safety violations." (Id. ¶ 77).  The March 15, 2006 press release mentions safety only once.  Under the heading "Sago Mine," the release quotes Hatfield as stating, "[w]e must learn lessons from this accident that will make coal miners safer in the years to come.  That is out commitment to the families of the twelve miners lost."  (Ex. B to Lead Pls.' Resp. to M.T.D.'s).  This statement is far from an assertion that at the time of the IPO or reorganization, IGC was operating its mines in a safe manner.  Reading the statement in a light most favorable to the plaintiffs, it is one of a future intent to operate safely.  One might, however, contend that the statement is a tacit admission that ICG operated in a less than safe manner in the past.  The press release of April 27, 2006 was similarly impotent to negate the "proliferation of media reports" which disclosed and detailed ICG's sub-par safety record.  Safety is mentioned no where in the release.

DeBenedictis, 492 F.3d at 218.  See also In re Openwave Systems

Secs. Litig., 528 F. Supp. 2d 236, 245 (S.D.N.Y 2007).   Further,

> while investors may not be considered to have been
> placed on inquiry notice where warning signs are
> accompanied by reliable words of comfort from
> management such that an investor of ordinary
> intelligence would reasonably rely on them to allay
> investor's concerns, plaintiffs in a securities fraud
> action may not simply rely on reassurances by
> management particularly when there are direct
> contradictions between the materials available to
> plaintiffs regarding the possibility of fraud.

In re Exxon mobil Corp. Secs. Litig., 387 F. Supp. 2d 407, 418

(D. N.J. 2005) (internal citations omitted).  In In re Openwave

Sytems Secs. Litig., for example, the court concluded that

"[m]anagement's aspirational statements concerning potential

financial restatements . . . [could not] have served to dissipate

plaintiff's duty to inquire," 528 F. Supp. 2d at 246, in light of

certain "news reports, public filings, and press releases"

indicating misrepresentations and omissions in the defendant's

financial statements.  Id.  "'Statements of cautious optimism,

reiterations of the goal of providing income to investors, and

explanations for past poor performance do not rise to the level .

. . necessary to excuse a reasonable investor from the duty of

inquiry.'"  LC Capital Partners, LP v. Frontier Ins. Group, Inc.,

318 F.3d 148, 155 (2d Cir. 2003) (quoting Farr v. Shearson Lehman

Hutton, Inc., 755 F. Supp. 1219, 1228 (S.D.N.Y. 1991)).  Neither

29

do "mere expressions of hope, devoid of any specific steps taken
. . . ." Id. at 156 (citing In re JWP Inc. Secs. Litig., 928 F.
Supp. 1239, 1250 (S.D.N.Y. 1996).

The "reassuring" press releases cited by the plaintiffs
were insufficient to allay a reasonable investor's concerns
inasmuch as they were directly contradicted by the highly
significant problems with ICG's safety record documented in the
overwhelming negative publicity of ICG occurring in the aftermath
of the Sago tragedy.  Furthermore, two press releases of June 6
and September 12, 2006 mentioned in the amended complaint, but
not cited by the lead plaintiffs in their response to the motions
to dismiss, reduced the earnings expectations for ICG, citing the
Sago mine disaster and Viper mine fire, and thus did not reassure
investors.  (Am. Compl. ¶¶ 80, 83).

On September 23, 2008, lead plaintiffs filed a notice
of supplemental authority, providing the court with the recent
decision of In re Merck & Co. Secs., Derivative & ERISA
Litigation, Nos. 07-2431, 07-2432, 2008 WL 4138476 (3rd Cir.
Sept. 9, 2008) ("Merck").  The decision reversed the lower
court's ruling in In re Merck & Co., Inc. Sec. Derivative & ERISA
Litig., 438 F. Supp. 2d 407 (D. N.J.), a case, according to the

30

plaintiffs, "heavily relied upon" by the defendants in their motion to dismiss briefing.  (Lead Pls.' Not. of Supp. Auth. at 1).  While the defendants did, in part, rely on the lower court's opinion, the case provided by the plaintiffs does not provide the support they seek.

In Merck, plaintiffs challenged the veracity of defendants' statements of opinion and belief regarding the increased risk of heart attacks posed by the use of the drug Vioxx.  Plaintiffs claimed that defendants' "statements and omissions . . . materially misrepresented the safety and commercial viability of Vioxx" in violation of, inter alia, sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Merck, 2008 WL 4138476, at *7.  The question presented was when plaintiffs were on inquiry notice that defendants did not believe the "naproxen hypothesis."  The naproxen hypothesis had been publicly relied upon by the defendants to explain away studies tending to show that users of Vioxx faced increased risks of harmful cardiovascular events.  In finding plaintiffs' claims to be time barred, the lower court relied upon the vast array of publicly available information regarding, what some claimed to be, the risks involved in the use of Vioxx.  The Third Circuit reversed, noting that "for misrepresentation in an opinion or

31

belief to be actionable, plaintiffs must show that the statement was issued without a genuine belief or reasonable basis." _Id._ at *13. As of the date the lower court found the plaintiffs to have been on inquiry notice, "market analysts, scientists, the press, and . . . the FDA agreed that the naproxen hypothesis was plausible, at the very least. None suggested that Merck believed otherwise." _Id._ at *19. It was not until a study definitively revealing the increased risk of heart attacks in patients taking Vioxx that plaintiffs were given adequate cause to suspect that the defendants did not believe the naproxen hypothesis. _Id._

Here, lead plaintiffs' claim is not so subtle. In its essence, and fairly read, plaintiffs' complaint alleges that while documents relating to the reorganization and IPO stated that ICG operated safely, this was not the case. Unlike in _Merck_, publicly available information clearly and unequivocally belied this assertion. The question in _Merck_ was whether plaintiffs were on inquiry notice that defendants did not subscribe to their asserted beliefs. Given the morass of public information, some of which tended to corroborate defendants' assertions, the court found the lower court to have erred in finding plaintiffs claims time barred as a matter of law. _Id._ ICG's claim that it operated safely was either true or untrue.

The proliferation of news reports beginning January 3, 2006 clearly pointed to the latter being the case.

Lead plaintiffs correctly note that Merck deemed the effect of public disclosures on stock price relevant to the determination of whether such disclosures constitute storm warnings.  Id. at *14; (Lead Pls.' Not. of Supp. Auth. at 2). Plaintiffs contend that "the press accounts of safety violations in early 2006 did not materially affect ICG's stock price." (Lead Pls.' Not. of Supp. Auth. at 2).  Yet, plaintiffs' complaint, immediately following a recitation of various public disclosures by the press, and ICG itself, evidencing the company's sub-par safety record, states "[b]y March 1, 2006, the price of ICG had declined to $8.45 per share--over 23% below the IPO price."  (Am. Compl. ¶ 78).  This 23% decline, which plaintiffs' complaint attributes to the revelation of ICG's safety record, strongly indicates that plaintiffs "had sufficient information of possible wrongdoing to place them on inquiry notice or to excite storm warnings of culpable activity."  Merck, 2008 WL 4138476, at * 11 (citing Benak, 435 F.3d at 400). Further, if plaintiffs' linkage theory is to be given any weight, the decline shows that the market was more than able to link the

33

affect of ICG's safety record to its bottom line.[7]

Lead plaintiffs further contend that there remains a factual dispute sufficient to deny the motions to dismiss.  (Lead Pls.' Resp. to M.S.J.'s at 27).  In assuming the facts pled in the amended complaint as true, the court concludes the claims against the defendants are barred by the statute of limitations inasmuch as the Sago tragedy occurred on January 2, 2006, the "avalanche of media reports" detailing ICG's safety record were published between January 3 and 24, 2006, the admission by ICG that its safety record was not as excellent as previously disclosed took place on or before February 1, 2006, and the declining stock prices were evident on or before March 1, 2006 when the price had fallen by 23%.

Inasmuch as the court finds that the one-year statute of limitations period has expired prior to the filing of this

---

[7]  The decline in stock value is also evidence that the press releases issued by ICG in January, March and April in no way duped the market into believing ICG's safety record was anything but lackluster.  "[I]n an efficient market, information important to reasonable investors . . . is immediately incorporated into the stock price."  Merck, 2008 WL 4138476, at *14 (internal quotation marks omitted).  On March 1, 2006, ICG stock was 23% below the IPO price.  (Am. Compl. ¶ 78).  By September 26, 2006, the stock had fallen by 63%.  (Id. ¶ 83).  It thus appears that it was the media reports documenting ICG's poor safety record, and not the three press releases, that reasonable investors deemed to be of import.

action on April 5, 2007, defendants' additional arguments
regarding the "bespeaks caution" doctrine, the asserted
immateriality of the alleged misrepresentations and omissions,
various pleading deficiencies, and standing need not be
considered.

III.

It is, accordingly, ORDERED as follows:

1.   The motion to dismiss of the underwriter
     defendants be, and it hereby is, granted;

2.   The motion to dismiss of the ICG defendants be,
     and it hereby is, granted.

3.   This action is dismissed.

The Clerk is directed to forward copies of this
memorandum opinion and order to all counsel of record.

DATED:  September 30, 2008

John T. Copenhaver, Jr.
United States District Judge